YOUNG, J.
Plaintiff Lisa Brown was a security guard who had been assigned by her employer, Burns International Security (Burns), to provide security for defendant Samuel-Whittar Steel, Inc.[1] Michael Brown (Brown), an employee of defendant and no relation to plaintiff, raped plaintiff at defendant’s Detroit facility. Brown had no prior criminal record, no history of violent behavior, and certainly no history indicating that he harbored a propensity to commit rape. However, plaintiff alleges that Brown routinely made crude, sexually explicit comments to her when they interacted at defendant’s facility. We are asked to consider whether defendant’s knowledge of these comments created a basis for holding defendant, Brown’s employer, liable for the rape committed by Brown.
We hold that where an employee has no prior criminal record or history of violent behavior indicating a *548 propensity to rape, an employer is not liable solely on the basis of the employee’s lewd comments for a rape perpetrated by that employee if those comments failed to convey an unmistakable, particularized threat of rape. The Court of Appeals reliance on this Court’s decision in Hersh v Kentfield Builders, Inc, 385 Mich 410; 189 NW2d 286 (1971), was misplaced. Because Brown did not commit prior acts that would have put his employer on notice of Brown’s propensity to commit rape and Brown’s workplace speech was not predictive of this criminal act, defendant cannot be held liable for the rape.
We reverse the judgment of the Court of Appeals, reinstate the trial court’s order granting summary disposition in favor of defendant, and remand this case to the trial court for further proceedings consistent with this opinion.
I. FACTS AND PROCEDURAL HISTORY
Beginning in early 2000, plaintiff Lisa Brown worked for Burns as a security guard.[2] During this time, Burns assigned plaintiff to work the night shift at defendant’s Detroit plant. Plaintiffs duties during the night shift included answering and transferring telephone calls, inspecting employees and truck drivers as they left the facility, and making nightly rounds through the plant.
Michael Brown worked for defendant as a foreman. The record does not disclose anything remarkable about Brown or his tenure with defendant. Brown did not have a criminal record until he pleaded no contest to attempted third-degree criminal sexual conduct arising *549 out of his attack of plaintiff. At the time of the incident, Brown also worked the night shift.
Although it is unclear when the comments began, plaintiff alleges that Brown routinely made very crude, offensive sexual remarks to her.[3] Plaintiff testified that on at least three occasions she complained about Brown’s offensive comments to one of defendant’s plant managers, Harlan Gardner.[4] According to plaintiff, she last complained about Brown’s language in August or September 2000. Plaintiff also testified that she told another Burns security guard, Kim Avalon, about Brown’s lewd statements and that Avalon had been present during such an exchange between Brown and plaintiff. Plaintiff claims that the verbal harassment continued until the rape occurred in November 2000.[5]
On November 17, 2000, plaintiff was raped by Brown. As plaintiff made her nightly rounds through the plant, she noticed that a door leading into the administrative offices was ajar. As she walked toward that *550 part of the office building, plaintiff met Brown. Brown followed her into the offices and helped her turn off the lights and close the doors of the individual offices. After the office area was secured, Brown forced plaintiff into a nearby women’s restroom inside the building and raped her. Plaintiff immediately reported the incident to the police, who arrested Brown. Brown later pleaded no contest to a charge of attempted third-degree criminal sexual conduct. Understandably, plaintiff has testified that she suffered psychological trauma as a result of the rape and, as a result of this trauma, cannot return to work.
Plaintiff filed suit against defendant, Brown, and Harlan Gardner, seeking to recover damages caused by the rape, including damages for physical and psychological injury, lost wages, and medical expenses. She asserted two theories of liability against defendant: first, that defendant was vicariously hable for Brown’s actions under the doctrine of respondeat superior; and, second, that because she had complained about Brown’s lewd comments, defendant had notice of Brown’s propensity to commit violent acts and therefore defendant was negligent in failing to take reasonable steps to prevent the rape.
Defendant moved for summary disposition, which the trial court denied. After the parties conducted further discovery, defendant renewed its motion for summary disposition. The trial court granted this motion, ruling that there was no genuine issue of material fact concerning whether defendant was liable for the unforeseen criminal acts of Brown.
Plaintiff appealed to the Court of Appeals, challenging the dismissal of her negligence claim.[6] In a published opinion, deciding what it labeled a case of first *551 impression, the panel reversed the trial court’s order and held that plaintiff had presented a genuine issue of material fact that defendant knew or should have known of Brown’s criminal sexual propensities and, therefore, was liable under a negligence theory.[7] The panel cited in support this Court’s decision in Hersh and its own decisions in Samson v Saginaw Professional Bldg, Inc,[8] and Tyus v Booth,[9] although it conceded that all of those cases involved individuals who had had a history of engaging in prior violent acts. It also recognized that those cases did not consider “whether sexually aggressive and predatory words are sufficient to put an employer on notice of its employee’s propensity for violence.”[10] Nevertheless, the Court of Appeals determined that “the language and the circumstances were sufficient to create a jury question regarding whether [defendant] knew or should have known of Michael Brown’s violent propensities.”* [11]
Defendant sought leave to appeal in this Court. We heard oral argument on the application. In lieu of granting leave to appeal, pursuant to MCR 7.302(G)(1), we reverse the judgment of the Court of Appeals.
n. standard of review
This Court reviews de novo a decision to grant a motion for summary disposition.[12] We review a motion brought under MCR 2.116(C)(10) by considering the pleadings, admissions, and other evidence submitted by *552 the parties in the light most favorable to the nonmoving party.[13] Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law.[14] Whether one party owes a duty to another is a question of law reviewed de novo.[15]
III. ANALYSIS
a. DEFENDANT OWED NO DUTY TO PLAINTIFF TO PREVENT THE RAPE BECAUSE DEFENDANT HAD NO NOTICE OF BROWN’S PROPENSITY TO RAPE
Defendant argues that the Court of Appeals erred because Brown’s words alone could not have put defendant on notice of Brown’s propensity to rape. Therefore, defendant argues that it owed no duty to plaintiff in this case. We agree.
In order to make out a prima facie case of negligence, the plaintiff must prove the four elements of duty, breach of that duty, causation, and damages.[16] “The threshold question in a negligence action is whether the defendant owed a duty to the plaintiff.”[17] “Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor’s part for the benefit of the injured person.”[18] This Court has elsewhere defined “duty” as
a “ ‘question of whether the defendant is under any obligation for the benefit of the particular plaintiff and *553 concerns ‘the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other.’ ” “ ‘Duty’ is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.” [Buczkowski v McKay, 441 Mich 96, 100-101; 490 NW2d 330 (1992) (citations omitted).]
In Valcaniant v Detroit Edison Co,[19] this Court described the factors that are relevant “[i]n determining whether a legal duty exists,” such as the
“foreseeability of the harm, degree of certainty of injury, closeness of connection between the conduct and injury, moral blame attached to the conduct, polity of preventing future harm, and. .. the burdens and consequences of imposing a duty and the resulting liability for breach.” [Id,., quoting Buczkowski, 441 Mich at 101 n 4 (citing Prosser & Keaton, Torts [5th ed], § 53, p 359 n 24).]
When performing an analysis of whether a duty existed, this Court considers the foreseeability of harm to the plaintiff, although the “ ‘mere fact that an event is foreseeable does not impose a duty’ ” on the defendant.[20]
This case involves the initial question whether an employee’s criminal activity is foreseeable by his employer and whether the employer is liable for that criminal activity. In MacDonald v PKT, Inc,[21] this Court dealt with the foreseeability of criminal acts committed by invitees and limited the duty owed by an invitor. We stated:
A premises owner’s duty is limited to responding reasonably to situations occurring on the premises because, as a matter of public policy, we should not expect invitors to *554 assume that others will disobey the law. A merchant can assume that patrons will obey the criminal law. This assumption should continue until a specific situation occurs on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee. It is only a present situation on the premises, not any past incidents, that creates a duty to respond.
Subjecting a merchant to liability solely on the basis of a foreseeability analysis is misbegotten. Because criminal activity is irrational and unpredictable, it is in this sense invariably foreseeable everywhere. However, even police, who are specially trained and equipped to anticipate and deal with crime, are unfortunately unable universally to prevent it. This is a testament to the arbitrary nature of crime. Given these realities, it is unjustifiable to make merchants, who not only have much less experience than the police in dealing with criminal activity but are also without a community deputation to do so, effectively vicariously liable for the criminal acts of third parties.[22]
As in MacDonald, similar concerns of foreseeability and duty arise in the negligent retention context when we consider whether an employer may be held responsible for its employee’s criminal acts. Employers generally do not assume their employees are potential criminals, nor should they. Employers suffer from the same disability as invitors when attempting to predict an employee’s future criminal activity.
The harm suffered by plaintiff in this case was a criminal rape. It is argued that this rape was a foreseeable result of Brown’s offensive speech. We disagree. Without question, Brown’s words were crude and highly offensive. Plaintiffs complaints to one of defendant’s plant managers that Brown’s comments were offensive and made her uncomfortable, when coupled with her request that defendant make Brown cease *555 making such comments, gave defendant awareness of Brown’s propensity for vulgarity and arguably positioned her for remedies as provided in McClements v Ford Motor Co.[23] However, an employer can assume that its employees will obey our criminal laws. Therefore, it cannot reasonably anticipate that an employee’s lewd, tasteless comments are an inevitable prelude to rape if those comments did not clearly and unmistakably threaten particular criminal activity that would have put a reasonable employer on notice of an imminent risk of harm to a specific victim. Comments of a sexual nature do not inexorably lead to criminal sexual conduct any more than an exasperated, angry comment inexorably results in a violent criminal assault.
We do not hold that an employee’s words alone can never create a duty owed by the employer to a third party. This obviously would be an entirely different case if Brown had threatened to rape plaintiff and defendant was aware of these threats and failed to take reasonable measures in response.[24] Justice CAVANAGH has no use for a traditional test of foreseeability. He would allow a jury to impose liability on an employer if, in retrospect, *556 somehow the harm was avoidable. However, we will not transform the test of foreseeability into an “avoidability” test that would merely judge in hindsight whether the harm could have been avoided.[25] Brown’s comments, standing alone, were insufficient to place defendant on notice that Brown was a rapist.
To supply further context to Brown’s comments, it is noteworthy that not even plaintiff suspected that Brown would physically attack or rape her. While she testified at her deposition that she thought Brown was “weird,” she stated that she did not fear that he would perpetrate a physical assault. Plaintiff never testified that Brown had ever offensively touched her before November 17, 2000. It is inconceivable that defendant’s management officials should have anticipated or predicted Brown’s behavior any better than plaintiff, who directly witnessed the tone and tenor of Brown’s offensive statements and yet indicated that she never feared for her physical safety. Therefore, the lack of foreseeability of the harm in this case weighs definitively against imposing a duty on defendant.
Moreover, in addition to the lack of foreseeability of the harm, other important considerations that this Court identified in Buczkowski convince us that the relationship between plaintiff and defendant does not give rise to a duty under these circumstances. The moral blame attached to the conduct in question, a rape, rests with the perpetrator, Michael Brown, not *557 with his employer. Also, there was a low degree of certainty of rape because there was not a “close” connection between Michael Brown’s statements and the resulting rape. And imposing a duty on defendant would not effectively further a policy of preventing future harm, and would impose an undue burden on defendant and all employers.
In our estimation, the legal duty articulated by the Court of Appeals would invite burdensome, over-inclusive employer regulation of employee workplace speech. Modern workplace speech is, at times, boorish and undesirable, but, depending on what precisely is said, it may be no predictor at all of future criminal behavior, as is the case here.[26] As a general rule, an employer cannot accurately predict an employee’s future criminal behavior solely on the basis of the employee’s workplace speech. An employer diligently seeking to avoid such broad tort liability would inevitably err on the side of over-inclusiveness and cast a wide net scrutinizing all employee speech that could be remotely construed as threatening. However, as this Court astutely observed in Hersh, “ ‘not every infirmity of character’ ” is sufficient to forewarn the employer of its employee’s violent propensities.[27] If every inappropriate workplace comment could supply sufficient notice of an employee’s propensity to commit future violent acts, a prudent employer operating under the duty fashioned by the Court of Appeals ought to treat every employee who makes inappropriate workplace comments as a *558 potentially violent criminal. The additional social and economic costs associated with this type of monitoring, not to mention the burden on otherwise innocent employees who make inappropriate comments in the workplace but harbor no violent propensities, weigh further against imposing the duty created by the Court of Appeals.
b. HERSH DOES NOT PROVIDE SUPPORT FOR THE EXPANDED DUTY IMPOSED BY THE COURT OF APPEALS IN THIS CASE
In concluding that plaintiff created a jurysubmissible question of negligence, the Court of Appeals relied on this Court’s decision in Hersh. Regarding defendant’s duty to plaintiff, the panel opined that there is
no requirement, in Hersh or elsewhere, that an employer must know that the employee had a propensity to commit the actual crime that occurred. Rather, it is sufficient under Hersh if the employer knew of the employee’s “impropriety, violence, or disorder,” in short, whether the employer could have reasonably foreseen the employee’s “violent propensity,” that is, his or her “natural inclination or tendency” to violence. Given what Michael Brown said to Lisa Brown and what Lisa Brown reported to [defendant’s] plant manager, we conclude that a jury could find that [defendant] should have, under these circumstances, known of Michael Brown’s propensity for sexual violence. There was, therefore, a genuine issue of material fact, and the trial court erred when it granted summary disposition on Lisa Brown’s negligence claim. The question whether [defendant] knew or should have known of Michael Brown’s vicious propensities should not have been determined by the trial court as a matter of law, but by the jury. [Brown, 270 Mich App at 700-701.]
In Hersh, the plaintiff brought a negligence claim against the defendant, Kentfield Builders, Inc., arising out of an unprovoked attack inflicted by one of the *559 defendant’s employees on the plaintiff. The plaintiff, a kitchen cabinet salesman, had scheduled a meeting with the president of Kentfield Builders at one of the defendant’s model homes, and while he waited to meet with the president, he was seriously injured by Benton Hutchinson, an unskilled laborer employed by the defendant who ten years earlier had been convicted of manslaughter. The plaintiff alleged that the defendant was liable for his injuries because it knew or should have known that Hutchinson harbored vicious and murderous propensities.
The plaintiff received a favorable jury verdict, which the Court of Appeals set aside because it found no evidence, notwithstanding Hutchinson’s prior manslaughter conviction, revealing that Hutchinson had “assaultive propensities” or that Kentfield Builders acted unreasonably in hiring him.[28]
This Court unanimously reversed the judgment of the Court of Appeals and reinstated the jury’s verdict in Hersh, holding that whether Kentfield Builders knew or should have known of Hutchinson’s vicious propensities was a jury question that could not be decided as a matter of law. In its analysis, this Court quoted with approval a headnote from Bradley v Stevens,[29] which stated that
*560 “[a]n employer who knew or should have known of his employee’s propensities and criminal record before commission of an intentional tort by employee upon customer who came to employer’s place of business would be liable for damages to such customer.” [Hersh, 385 Mich at 412.]
This Court also quoted with approval the statement from 34 ALR2d 390, § 9, that
“[a]s has already been noted, a duty imposed upon an employer who invited the general public to his premises, and whose employees are brought into contact with the members of such public in the course of the master’s business, is that of exercising reasonable care for the safety of his customers, patrons, or other invitees. It has been held that in fulfilling such duty, an employer must use due care to avoid the selection or retention of an employee whom he knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer. The employer’s knowledge of past acts of impropriety, violence, or disorder on the part of the employee is generally considered sufficient to forewarn the employer who selects or retains such employee in his service that he may eventually commit an assault, although not every infirmity of character, such, for example, as dishonesty or querulousness, will lead to such result.” [Hersh, 385 Mich at 412-413 (emphasis added).]
In its analysis, the panel below emphasized selective portions of this passage from Hersh. Quoting Hersh, the panel held that “it is sufficient under Hersh if the employer knew of the employee’s ‘impropriety, violence, or disorder,’ in short, whether the employer could have reasonably foreseen the employee’s ‘violent propensity,’ that is, his or her ‘natural inclination or tendency’ to violence.”[30] What the panel omitted from its quotation from Hersh was the complete statement that “ ‘[t]he employer’s knowledge of past acts of impropriety, vio *561 lence, or disorder on the part of the employee is generally considered sufficient to forewarn the employer . . .”[31] This Court emphasized in Hersh that it is the employee’s known past acts that provide a basis for the employer’s knowledge of the employee’s “impropriety, violence, or disorder” and that those acts potentially place an employer on notice of the employee’s violent propensities.
Beyond the fact that the Court of Appeals misconstrued this portion of Hersh, Hersh is largely inapposite to this case.[32] The employee in Hersh who assaulted the *562 third party had a criminal record and had committed a prior, violent criminal act. The panel below acknowledged that Brown had not committed prior acts that would have put defendant on notice of Brown’s propensity to commit any criminal act, including rape. This fact is enough to distinguish this case from Hersh. The more important question, which Hersh did not address, is whether an employer is entitled to judgment as a matter of law when the sole basis for imposing liability for an employee’s rape of a third party is the employee’s lewd and offensive comments. As we discussed earlier, however weak or strong a prior act of violence may be as a predictor of future violence, the workplace speech in this case and the entire absence of any history of violence provide an insufficient predicate for imposing a duty of care of the kind the panel below recognized.
IV RESPONSE TO THE DISSENT
While we have sought to maintain in our duty analysis a key tort concept — foreseeability—Justice CAVANAGH in his dissent has swept this concept aside, concluding that any inappropriate workplace speech by an employee that is followed at some point by a criminal act is sufficient to create a jury-submissible question of negligent retention. In contrast, we have attempted to preserve a workable rule of foreseeability in this context, limiting employer liability to instances in which an employee has done or uttered something of which the employer has or should have knowledge that affords genuine notice of that employee’s criminal propensities. This is not a novel or *563 surprising requirement. By eliminating this link of foreseeability, which is what Justice CAVANAGH advocates, an employer would be held strictly hable for employee misbehavior, whether foreseeable or not.
Justice CAVANAGH emphasizes that once defendant learned of Brown’s harassing comments, it was on notice of Brown’s “habits, temperament, or nature.” But this conclusion, of course, begs the question: Brown’s habits, temperament, or nature signified his propensity to do what? Did his words demonstrate his “habit, temperament, and nature” to continue to harass women, in particular plaintiff, with foul and unwanted sexual comments, or did they demonstrate his “habit, temperament, and nature” to commit violent rape? Justice CAVANAGH’s theory of liability is simply that defendant was on notice that Brown was a rapist because he made unwanted sexual comments. However, evidence of making unwanted sexual comments is not evidence of a propensity to commit violent rape. It simply cannot be the responsibility of the employer to determine with clairvoyant accuracy whether conduct of one sort might bear some relationship to conduct of a completely different sort. Rather, if an employee has not done or said anything that would afford a reasonable employer notice of a propensity to rape or commit some other type of criminal conduct, there is no sound legal or commonsense basis for the imposition of tort liability on an employer.
Justice CAVANAGH states, “I fail to see why it would not be more desirable to have employers scrutinize threatening speech than to ignore it when reported and have an innocent employee raped.”[33] In light of the causal link, illogical as it is, that Justice CAVANAGH *564 forges between defendant’s alleged “nonscrutiny” and the ensuing rape, it is worth asking Justice CAVANAGH to identify the purpose of the “scrutiny” that he urges. It is not clear whether proper scrutiny means that an employer must merely confirm that the employee’s speech was “crude,” or if the utterance of any crude statement is grounds for termination. It is equally unclear if, under Justice CAVANAGH’s approach, an employer could successfully “rehabilitate” its “tainted” employees, or if it must inevitably fire them. Finally, Justice CAVANAGH’s assertion offers no guidance concerning whether an employer’s duty to scrutinize is limited to employee speech or whether it could extend to an employee’s seemingly harmless but quirky behavior. These are but a few of the many practical questions Justice CAVANAGH’s theory of liability poses without answering.
If Justice CAVANAGH’s position were to prevail, the consequences would be considerable. Any rational employer would protect itself by refusing to hire or by terminating employees whose behavioral clues might allow courts, in hindsight, to hold the employer responsible if the employee commits a crime. In some instances, employers would find themselves in the unenviable position of seeking to protect themselves from liability for “negligent retention,” while also avoiding liability under various antidiscrimination laws governing employment.[34]
*565 In other instances, employees who have committed crimes in the past, but have presumably repaid their debts to society, would find it more difficult to secure employment, as would job applicants who have been identified by employers, or by the experts that employers would retain, as having the potential for negative behavioral actions, including crimes. It goes without saying that the effect of this new regime would, in both subtle and not-so-subtle ways, fall most heavily on social groups with the highest prevalence of past criminal behavior.[35] Unlike Justice CAVANAGH, we refuse to create a new standard for imposing tort liability on employers and thereby render large numbers of job applicants effectively unemployable.[36]
*566 v CONCLUSION
We conclude that defendant may not be held liable for the rape perpetrated against plaintiff by Brown. The Court of Appeals expanded defendant’s duty on the basis of plaintiffs complaints that Brown’s sexually explicit and offensive comments made her uncomfortable. Defendant could not reasonably have anticipated that Brown’s vulgarities would culminate in a rape. We simply disagree with the Court of Appeals “that a jury could find that [defendant] should have, under these circumstances, known of Michael Brown’s propensity for sexual violence.”[37] Accordingly, we reverse the judgment of the Court of Appeals, reinstate the trial court’s order granting summary disposition in favor of defendant, and remand this case to the trial court for further proceedings consistent with this opinion.
Taylor, C.J., and Corrigan and Markman, JJ, concurred with Young, J.

 Plaintiff filed suit against Samuel-Whittar Steel, Michael Brown, and Harlan Gardner. A default judgment was entered against Brown when he failed to respond to plaintiffs suit. Plaintiff failed to serve Gardner. Neither Brown nor Gardner is part of this appeal. Therefore, we refer to Samuel-Whittar Steel singularly as “defendant.”

 Although the dissent characterizes plaintiff as Brown’s “subordinate,” post at 574 n 3, we note that plaintiff and Michael Brown worked for different employers.

 Plaintiff summarized the nature of these remarks when she testified at deposition that Brown “would tell me how he loved my long hair and how he would want to f*** me and pull my long hair and umm, just how I would walk through the plant and he liked how I shaked [sic] my a** and I had big t*** and just all the terrible things like that.”

 Plaintiff testified that she told Gardner “how uncomfortable I felt about Michael Brown saying these things and [asked] if he could tell him to stop.”

 The dissent’s general assertion that Brown made his comments to plaintiff “late at night when he was acting as her supervisor and no one else was around” and that “[h]e made them for no one to hear but her,” post at 578-579, requires the dissent to speculate about an undeveloped record. The record indicates that Brown and plaintiff worked during the afternoon shift in the same time frame before they both were reassigned by their respective employers to work during the night shift. Moreover, plaintiff testified at her deposition that Brown made comments to her during the afternoon shift. Thus, it is simply unclear from the record how many of Brown’s comments were made while the two worked during the night shift and how often he made his comments while the two were alone or in the presence of others.

 Plaintiff did not pursue the dismissal of her respondeat superior claim, and it is not before us.

 Brown v Brown, 270 Mich App 689; 716 NW2d 626 (2006).

 44 Mich App 658; 205 NW2d 833 (1973).

 64 Mich App 88; 235 NW2d 69 (1975).

 Brown, 270 Mich App at 699 (emphasis in original).

 Id. at 700.

 City of Taylor v Detroit Edison Co, 475 Mich 109, 115; 715 NW2d 28 (2006).

 Reed v Breton, 475 Mich 531, 537; 718 NW2d 770 (2006), citing Maiden v Rozwood, 461 Mich 109, 118; 597 NW2d 817 (1999).

 Greene v AP Products, Ltd, 475 Mich 502, 507; 717 NW2d 855 (2006).

 Fultz v Union-Commerce Assoc, 470 Mich 460, 463; 683 NW2d 587 (2004).

 Id. at 463.

 Id.

 Moning v Alfono, 400 Mich 425, 438-439; 254 NW2d 759 (1977).

 470 Mich 82, 86; 679 NW2d 689 (2004).

 Buczkowski, 441 Mich at 101, quoting Samson, 393 Mich at 406.

 464 Mich 322; 628 NW2d 33 (2001).

22 Id. at 335 (citations omitted).

 473 Mich 373; 702 NW2d 166 (2005). After the trial court adjudicated this case, this Court decided McClements, in which we held that a common-law claim for negligent retention cannot be premised on workplace sexual harassment, because a plaintiffs remedies for any act of sexual harassment in the workplace are those provided by the Civil Rights Act (CRA). Id. at 382-383. In McClements, we also clarified that a nonemployee may sue under the CRA if he or she is sexually harassed and the defendant affected or controlled a term, condition, or privilege of the worker’s employment. Id. at 389. As in McClements, the availability of this statutory remedy augers against further expanding the scope of common-law negligent retention to the facts of this case. We note, however, that plaintiff did not file a CRA claim in this case. The record is thus undeveloped with respect to whether such a claim would have succeeded here, and we decline to speculate further.

 Although Justice Cavanagh attempts to equate Brown’s unwanted invitations with a declaration of intent to rape, none of the comments *556 directed at plaintiff in this case approached a particularized threat of criminal violence. Not even plaintiff believed she was being threatened with potential rape.

 This is not the first occasion in which Justice Cavanagh has articulated a position that would essentially eliminate foreseeability in favor of the imposition of strict liability on a business whenever a person is harmed. See Anderson v Pine Knob Ski Resort, Inc, 469 Mich 20, 29; 664 NW2d 756 (2003) (Cavanagh, J., dissenting).

 Contrary to our dissenting colleague, who finds that Brown’s comments were beyond boorish, we note that “boorish” accurately describes Brown’s words. “Boorish” is defined in Random House Webster’s College Dictionary (2001) as “unmannered; crude; insensitive.” The same dictionary defines “crude” as “vulgar” and “vulgar” as “indecent; obscene; lewd.”

 Hersh, 385 Mich at 413, quoting 34 ALR2d 390, § 9.

 Hersh v Kentfield Builders, Inc, 19 Mich App 43; 172 NW2d 56 (1969).

 329 Mich 556; 46 NW2d 382 (1951). In Bradley, the defendant, the owner of an auto service shop, was sued hy a customer who had been physically attacked by an employee in an attempted rape. This Court affirmed a judgment of no cause of action that had been entered in favor of the defendant, agreeing with the trial court that the defendant would have been hable only if he knew or should have known of his employee’s propensities and criminal record. Significantly, although the defendant knew that the employee had been convicted of nonsupport, the record indicated that he had no knowledge that the employee had recently been charged with common-law rape.

 Brown, 270 Mich App at 701.

 Hersh, 385 Mich at 413, quoting 34 ALR2d 390, § 9 (emphasis added).

 The Court of Appeals also relied on Samson v Saginaw Professional Bldg, Inc, 44 Mich App 658; 205 NW2d 833 (1973), and Tyus v Booth, 64 Mich App 88; 235 NW2d 69 (1975). The panel recognized that neither case provided direct support for its holding. Therefore, these cases are also not central to our analysis.
Samson did not address an employer’s negligent retention of an employee. It addressed a landlord’s duty to protect its tenants’ employees from individuals with violent propensities in the common areas of the building over which the landlord had responsibility. In Samson, the plaintiff worked in a building owned by the landlord defendant, which leased space to the plaintiffs employer. Another tenant in the building was the Saginaw Valley Consultation Center, an agency that provided outpatient care for released mental patients. The plaintiff was attacked by a mental patient as they rode the elevator in the building. A split Court of Appeals panel held that the landlord defendant owed a duty to take reasonable precautions to protect its tenants from mental patients with a propensity toward violence who would be visiting the consultation center.
Tyus involved an employer’s liability under a theory of negligent retention. In Tyus, the plaintiffs sued the owner of a service station whose employee assaulted the plaintiffs without provocation. One theory of liability advanced by the plaintiffs was that the owner had negligently exposed the public to an employee with known violent propensities. The Court of Appeals, citing Hersh, affirmed the trial court’s grant of summary disposition in favor of the defendant. Significantly, the panel noted that the defendant had no actual prior knowledge of the employee’s propensity for violence, and concluded that the defendant “was not *562 required to conduct an in-depth background investigation of his employee.” Id. at 92. Moreover, it held that “[a]n employer is not absolutely liable for assault committed by his employee,” but only owes a duty “to use reasonable care to assure that the employee known to have violent propensities is not unreasonably exposed to the public.” Id.

 Post at 577.

 Indeed, Justice Cavanagh would impose a “Catch-22” duty on employers to detect their employees’ criminal propensities even though employers are not fully equipped to reasonably fulfill that duty. A part of the judicially created common law, a negligent retention action works interstitially in the gaps of the positive law enacted by our Legislature, such as the CRA, or applicable federal law enacted by Congress. If the Legislature has determined as a matter of public policy that fruitful information regarding previous employee “conduct” is off limits, thus *565 hampering an employer from comprehensively investigating its employees’ criminal propensities, we ought not to broaden our common law and create insurmountable barriers for employers working to fulfill their common-law duties. See, e.g., MCL 37.2205a (prohibiting an employer from requesting, making, or maintaining a record of information regarding a misdemeanor arrest if a conviction did not result). This is especially true in Justice Cavanagh’s world, where virtually any piece of information then available to an employer about an employee’s speech, behavior, or actions could, when judged in hindsight, create a jury-submissible question of negligence if the employee later commits a criminal act. In light of the expansive tort liability to which Justice Cavanagh would expose employers, they should not face the challenge of accurately forecasting their employees’ future criminal acts when the Legislature has curtailed the scope of information at their disposal.

 See, e.g., Human Rights Watch Press Backgrounder, Percentage of Adult Men (Age 18-64) Incarcerated, by Race, available at <http://www.hrw.org/backgrounder/usa/race/pdf/table3.pdf.> (accessed June 6, 2007); see also Incarcerated America, Human Rights Watch Backgrounder, available at <http://www.hrw.org/backgrounder/usa/ incarceration> (accessed June 6, 2007).

 Once again, we in no way make light of the comments that Brown made in this case. Although these comments did not put defendant on notice of a propensity to rape, they were obviously exceedingly inappropriate and offensive. However, the issue here is not whether the comments were offensive, or a violation of our Civil Rights Act, see MCL 37.2103(i), but whether the comments placed defendant on notice that a rape was foreseeable and thereby made defendant liable for the rape.

 Brown, 270 Mich App at 701.