# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF SHARITA M. WILLIAMS, by
DELISHA M. WILLIAMS, Personal
Representative,

        Plaintiff-Appellee,

v

CONSUELLA LEWIS and U.S. SECURITY
ASSOCIATES, INC., doing business as
ADVANCED SECURITY,

        Defendant-Appellants.

UNPUBLISHED
November 21, 2017

No. 332755
Wayne Circuit Court
LC No. 15-000780-NO

Before: JANSEN, P.J., and CAVANAGH and GADOLA, JJ.

PER CURIAM.

Defendants appeal by leave granted[1] a circuit court order denying their motion for summary disposition in this negligence/wrongful death action. We reverse.

## I. FACTS AND PROCEDURE

This case arises from a workplace murder-suicide that took place at a Detroit area medical clinic operated by Park Family Healthcare, P.C. (Park). Park maintenance man Myron Williams entered the clinic on the morning of April 9, 2013 and fatally shot plaintiff's decedent Sharita Williams before setting the building on fire and taking his own life. Defendant Consuella Lewis was on duty that morning, working as an unarmed security guard for Advanced Security, the company Park had contracted to provide security services at the clinic.

Plaintiff brought this wrongful death action against Lewis and Advanced Security for failing to protect Williams against Myron's criminal act.[2] According to the allegations in

---

[1] *Williams Estate v Lewis*, unpublished order of the Court of Appeals, entered September 30, 2016 (Docket No. 332755).

-1-

plaintiff's complaint, Williams had been romantically involved with Myron, her coworker, for about a year when Williams discovered that Myron, a married man, had no plans to leave his wife. After Williams ended the relationship, Myron began harassing Williams and her new boyfriend with telephone calls and over social media. Williams also complained that Myron was stalking her and threatening her and her children with physical violence. Williams told several coworkers, including Lewis, that she suspected Myron of breaking into her home and stealing her van, an incident which occurred a month before the shooting and prompted Williams to relocate. Williams reported Myron's threats to the police on multiple occasions, and on April 3, 2013, six days before the shooting, Williams obtained a personal protection order (PPO) against Myron. Williams asked Lewis to serve the PPO on Myron, but Lewis declined.

Defendants moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that they could not be found liable because Myron's act was unforeseeable and they were without a duty to protect Williams against unforeseeable criminal acts. In response, plaintiff argued that because Lewis was aware that Williams had obtained the PPO against Myron, she had a duty to call 911 or alert someone that Myron had entered the clinic while Williams was inside.[3] The trial court denied defendants' motion after determining that questions of fact remained regarding the foreseeability of Myron's criminal acts and the existence of a duty to protect Williams.

On appeal, defendants argue that the trial court erred when it denied their motion for summary disposition because defendants were under no legal duty to protect Williams from a criminal attack by a third party. We agree.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision to grant or deny a motion for summary disposition. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). A motion under MCR 2.116(C)(10) "tests the factual sufficiency of a complaint." *Urbain v Beierling*, 301 Mich App 114, 122; 835 NW2d 455 (2013). Summary disposition is proper under MCR 2.116(C)(10) if "there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "The moving party has the initial burden to support its claim for summary disposition by affidavits, depositions, admissions, or other documentary evidence." *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App 684, 693; 818 NW2d 410 (2012). The court must consider all of the admissible evidence in a light most favorable to the nonmoving party. *Liparoto Constr, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 29; 772 NW2d 801 (2009). However, the party opposing summary disposition under MCR 2.116(C)(10) "may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists." *Oliver v Smith*, 269 Mich App 560, 564; 715 NW2d 314 (2006) (citation omitted).

---

[2] Plaintiff filed a second lawsuit against Park and several named individuals, which the lower court ultimately consolidated with this case. However, Park and the individual defendants named in the second lawsuit are not parties to this appeal.

[3] Plaintiffs raised similar allegations against Advanced Security, arguing that as Lewis's employer it is liable for her negligent conduct.

The trial court denied defendants' motion for summary disposition after finding that questions of fact remained that precluded its consideration of whether defendants owed a duty to Williams. The existence of a legal duty is a question of law for the trial court to decide, *Hill v Sears Roebuck and Co*, 492 Mich 651, 659; 822 NW2d 190 (2012), and the facts material to the trial court's duty determination were undisputed. The trial court therefore erred when it declined to rule on the issue of duty. However, because the question of whether defendants owed a duty to Williams is one this Court reviews de novo, *id*., we can address summarily the issues raised on appeal.

## III. DUTY TO PROTECT

Plaintiff brings a wrongful death claim premised on defendants' alleged negligence. "The threshold question in a negligence action is whether the defendant owed a duty to the plaintiff." *Brown v Brown*, 478 Mich 545, 552; 739 NW2d 313 (2007) (quotation marks and citation omitted.) "Duty is actually a question of whether the defendant is under any obligation for the benefit of the particular plaintiff and concerns the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other." *Marcelletti v Bathani*, 198 Mich App 655, 663; 500 NW2d 124 (1993) (quotation marks and citation omitted).

In the absence of a special relationship, the law imposes no duty on one party to protect another against the criminal acts of a third party. *Bailey v Schaaf*, 494 Mich 595, 604; 835 NW2d 413 (2013) (*Bailey II*). "The rationale underlying this general rule is the fact that criminal activity, by its deviant nature, is normally unforeseeable," and "under all ordinary and normal circumstances, in the absence of any reason to expect the contrary, [an] actor may reasonably proceed upon the assumption that others will obey the criminal law." *Graves v Warner Bros*, 253 Mich App 486, 493; 656 NW2d 195 (2002) (quotation marks, citations, and alterations omitted).

A special relationship exists where one party "entrusts himself to the control and protection of another, with a consequent loss of control to protect himself." *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 499; 418 NW2d 381 (1988). Our courts have recognized special relationships between common carriers and passengers, innkeepers and guests, teachers and students, doctors and patients, employers and employees, and merchants and business invitees. *Id*. at 499-500. However, in *Krass v Tri-County Security, Inc*, 233 Mich App 661, 671-672; 593 NW2d 578 (1999), this Court declined to extend recognition as a special relationship to an invitee's relationship with an independently-contracted security company retained by a business invitor.

*Krass* involved the assault and murder of the decedent by a stranger in a parking lot near Harpo's Concert Theater, the decedent's destination, which was owned by Baldini, Inc. *Id*. at 663-664. A security guard working for Tri-County Security, the company Baldini contracted to provide concert security, had directed the decedent to park his car in that particular parking lot. *Id*. The decedent's estate sued Tri-County in negligence, arguing that it had owed the decedent a duty to protect against the criminal acts of others. *Id*. The trial court granted Tri-County's motion for summary disposition on the basis that Tri-County owed the decedent no such duty, and we affirmed. *Id*. at 664. This Court recognized that based on a special relationship between Baldini and the decedent, as a business invitor to an invitee, Baldini may have had a duty to

protect the decedent against certain criminal acts. *Id*. at 670-672. However, this Court emphasized that as a contracted security company, Tri-County did not possess the requisite control over the premises, and any special relationship existed only between Baldini and the decedent. *Id*. Accordingly, this Court concluded that

> there is no legal relationship whatever between [the decedent] and Tri-County. Any legal connection between [the decedent] and Tri-County derives from the contract between Baldini, Inc., and Tri-County. Simply put, therefore, if Baldini, Inc., owed no duty to [the decedent] as its business invitee, then neither, on a derivative basis, did Tri-County. [*Id*. at 672.]

Although *Krass* involved a business invitor-invitee relationship, rather than an employer-employee relationship like the one presented here, we hold that the same reasoning precludes recognition of any special relationship between an employee and a security company contracting with that employee's employer. In this case, therefore, there is no legal relationship between Advance Security and Park's employees. Any legal connection between Williams, as Park's employee, and Advance Security is derived from the contract between Park and Advance Security. Accordingly, if Park did not owe Williams a duty to protect her from the criminal acts of third parties, then neither, by derivative, did Advance Security.

Given the extent of their control over their premises, we have imposed upon merchants and landlords a duty "to use reasonable care to protect their identifiable invitees from the foreseeable criminal acts of third parties." *Bailey II*, 494 Mich at 612-613 (quotation marks and citation omitted). However, we have recognized that despite the level of control these individuals maintain, there can be no duty to anticipate and prevent criminal acts of third parties. *Id*. at 613.

> [B]ecause criminal activity is irrational and unpredictable, it is in this sense invariably foreseeable everywhere. As a result, it is unjustifiable to make merchants, who not only have much less experience than the police in dealing with criminal activity but are also without a community deputation to do so, effectively vicariously liable for the criminal acts of third parties. Although the element of control is essential in establishing a landlord or merchant's duty over the premises, they do not have effective control over situations involving spontaneous and sudden incidents of criminal activity. On the contrary, control is precisely what has been lost in such a situation. [*Id*.]

Given that "the duty to provide police protection is vested with the government, and given the unpredictability of specific acts of crime," *id*. at 616-617, the duty of a merchant or landlord to use reasonable care to protect their invitees and tenants, respectively, from criminal acts of third parties is limited in scope—requiring only reasonable expedition of police involvement after the crime has been committed, *id*. at 613, 616-617. Duty in this instance is a function of foreseeability. The duty of a merchant or landlord is not triggered until "it is given notice of a 'specific situation occurring on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee." *Id*. at 615, quoting *MacDonald v PKT, Inc*, 464 Mich 322, 335; 628 NW2d 33 (2001).

We have not yet considered the scope of an employer's duty to protect its employees from criminal acts of third parties. However, given the comparability of the employer-employee relationship to the landlord-tenant and business invitor-invitee relationships, we hold that the same limited duty applies. Park had no duty to predict and prevent unforeseeable criminal behavior on its premises. In the face of foreseeable criminal acts of third parties, Park owed Williams nothing more than a duty to reasonably expedite police involvement. In other words, Park, and Advanced Security derivatively, owed Williams a duty to call the police when "a specific situation occur[ed] on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable [tenant or invitee]." *Bailey II*, 494 Mich at 615 (quotation marks and citation omitted).

Plaintiff suggests that Myron's criminal act was foreseeable at the time he entered the clinic on the day of the incident, thereby triggering a duty on behalf of Lewis and Advanced Security. Plaintiff claims that Lewis knew Myron's presence at the clinic "may have created a risk" of harm to Williams, and cites the following evidence in support: (1) testimony from one of Williams's coworkers suggesting that Myron looked like "trouble" when he entered the clinic on the day of the incident, (2) Lewis's admission that she knew the relationship between Williams and Myron had ended on harsh terms, (3) Lewis's admission that she knew Williams had a new boyfriend, who had summoned the police while visiting the clinic only a week before Williams' death, (4) Lewis's admission that she knew that Myron had distributed nude photographs of Williams to one of Williams's acquaintances, (5) Lewis's admission that she knew that Williams's home and car had recently been broken into, and that Williams suspected Myron of perpetrating these crimes, (6) Lewis's admission that she knew that the day before Williams's death, Williams had contacted Myron's wife at her place of work, (7) Lewis's admission that she knew that Williams was in the process of obtaining a PPO against Myron, which would prohibit his admission to the clinic between 9:00 a.m. and 5:00 p.m., and (8) Lewis's admission that she knew that Myron had a concealed pistol license (CPL) and always carried his holstered firearm to work. Even viewing this evidence in a light most favorable to plaintiff, we are convinced that it would not have provided notice of a specific situation that would have caused a reasonable person to recognize a risk of imminent harm to Williams.

The fact that Lewis was aware of the ongoing troubled relationship between Myron and Williams is not proof that she was aware of any alleged violent propensity on Myron's part. Even if plaintiff could prove that Lewis knew the details surrounding Myron's harassment and stalking behavior, or suspected Myron of committing property crimes against Williams, it would be unreasonable to equate Lewis's awareness with notice that Myron might ultimately commit the heinous murder-suicide. Harassment and property crimes are not assault or murder, and are not predictors of violent behavior. See *Brown*, 478 Mich at 557 (declining to accept vulgar workplace comments as sufficient to forewarn of a person's propensity to commit violent acts). Plaintiff has offered no evidence to dispute Lewis's testimony that she had never seen nor heard Myron engage in any threatening behavior.

Further, the fact that Myron had a CPL and regularly carried his firearm to work would not provide Lewis with notice of a particularized, specific situation involving the potential for imminent harm. The evidence suggests that Myron had carried his firearm with tacit permission from his employer for many years, including the eight years Lewis was working at the clinic. Carrying a firearm with the appropriate licensing is not an indicator of criminality or a

propensity for violence, and Lewis would have no reason to suspect that Myron's decision to carry his firearm on the day of the incident, like every other day, was with a violent purpose. Plaintiff has provided no evidence to suggest that Myron ever threatened anyone with violence, or removed his firearm from its holster while inside the clinic. Plaintiff points to a police report filed on April 3, 2013, six days before the murder-suicide, detailing an incident where Myron allegedly grabbed at his firearm in a threatening manner while exchanging words with Ryan Chatman, a friend of Williams's new boyfriend, who was at the clinic to confront Myron about the alleged harassment. Plaintiff argues that this incident was enough to provide notice of Myron's potential for violence. However, although Lewis was at the clinic when Myron allegedly engaged in this threatening behavior, there is no evidence that Lewis was aware of the reported incident. When asked about it at her deposition, Lewis explained that a police officer entering the clinic told her he was there to speak with Chatman about a "person with a weapon." Lewis said she was aware of Myron's distribution of nude photographs, and assumed that Chatman had complained about the harassment. There is no evidence that a copy of the police report was provided to Lewis, anyone at Advanced Security, or anyone at Park before the date of Williams's death.

Similarly, Lewis's admitted knowledge of Williams's attempt to obtain a PPO against Myron, while perhaps plaintiff's strongest evidence, is insufficient to prove that Lewis had notice of a specific situation involving a risk of imminent and foreseeable harm. Although Lewis admits that Williams asked her to serve PPO papers on Myron, there is no evidence that she saw the PPO papers. Lewis stated that Williams told her that the PPO would restrict Myron's access to the clinic between 9:00 a.m. and 5:00 p.m., but claimed to have no other knowledge of the PPO's contents. A PPO can enjoin an individual from a variety of violent and nonviolent action, including harassment. Especially given Lewis's knowledge of Williams's ongoing allegations of harassment, it would be unreasonable to assume that Lewis's knowledge of the mere existence of PPO papers would place her on notice of Myron's propensity for violent, murderous behavior. Again, there is no evidence that a copy of the PPO was provided to Lewis or anyone at Advanced Security or Park before the incident.

Lewis's general awareness of the tumultuous relationship between Williams and Myron, while perhaps sufficient to spur broad suspicion, did not provide notice of the sort of particularized threat of imminent harm that would trigger her duty to protect Williams. Although factually distinguishable, we note that our Supreme Court's opinion in *Bailey II*, 494 Mich 595, supports our conclusion. In *Bailey II*, an apartment complex contracted with a security company to provide security personnel to patrol the premises. *Id*. at 600. During a social gathering at the apartment complex, two security guards learned that a nonresident was in the complex "brandishing a revolver and threatening to kill someone," but chose not to respond. *Id*. Sometime after, the security guards heard gunshots and ran to investigate, finding that the nonresident gun brandisher had shot the plaintiff twice in the back. *Id*. at 600-601. In that case, the Court held that the security guards had notice of an ongoing situation in which the apartment complex's tenants "faced a specific and imminent harm," triggering a duty to "reasonably expedite the involvement of the police[.]" *Id*. Key to the Court's holding was the fact that the security guards were explicitly aware of *ongoing* criminal behavior, and that the defendant was armed and making specific threats.

In contrast, our Supreme Court declined to impose a duty to protect on employers for the criminal acts of employees when the employers are generally aware of poor behavior but lack notice of a particularized threat of violence. In *Brown*, 478 Mich at 549-551, the Court considered the liability of an employer for an employee who raped a security guard. The employee had a history of making crude, sexually explicit remarks to the security guard, but had no criminal record or history of violent conduct. *Id*. at 548-549. The Court held that the employer could not be held liable for the rape because it "could not reasonably have anticipated that [the employee's] vulgarities would culminate in rape" and therefore had no duty to protect the security guard against the employee's criminal act. *Id*. at 566. Similarly, in *Hamed v Wayne County*, 490 Mich 1, 6-7; 803 NW2d 237 (2011), the Court considered the liability of an employer for a rape perpetrated on an inmate by an employee prison deputy. In that case, the deputy had made sexual advances toward the inmate, engaged in a physical fight with another inmate, made threatening phone calls to his landlord, and had a history of violating work-related policies. *Id*. at 15-16. However, the Court held that the deputy's history "at most, demonstrates that [the employer] was aware that [the deputy] had a propensity to disobey work-related protocol and engage in aggressive behavior when provoked." *Id*. at 16. The Court declined to hold the deputy's employer liable because the deputy's prior behavior was not similar to, and was therefore not a predictor of, the violent sexual assault ultimately perpetrated. *Id*. The Court explained:

> Criminal conduct is inherently arbitrary and highly unpredictable. As we noted in *Brown*, even law enforcement agencies, which are trained in detecting and preventing crime, cannot predict the occurrence of criminal acts. . . . [F]oreseeability is a necessary element for imposing liability, and, as we recently stated in *Brown*, we decline to "transform the test of foreseeability into an 'avoidability' test that would merely judge in hindsight whether the harm could have been avoided." [*Id*. at 13-14.]

Like the employer defendants in *Brown* and *Hamed*, Lewis lacked actual or constructive notice of Myron's propensity to engage in violent crime. There is no evidence that anyone at the clinic, including Williams, informed Lewis that she could expect Myron to behave violently, or that Myron should not be permitted to enter the building when Williams was inside. Further, Lewis was not aware of any specific, ongoing act of criminality on the premises that would trigger a duty to expedite police involvement. Lewis testified at her deposition that on the morning of the incident, she watched Myron walk up to the clinic and enter with his key. She explained that she did not stop him or call anyone inside the clinic to alert them of his presence because she was not aware of any reason why Myron would not be allowed inside. Lewis had no reason to suspect Myron's plan to engage in criminal behavior, and therefore had no duty to protect Williams or any other Park employee against it.

Plaintiff argues that because Lewis knew of the existence of a PPO, she "could not simply do *nothing* . . . she had to do *something*," and argues that even if Lewis did not have a duty to anticipate Myron's criminal act and intervene, she had a duty to call the police or alert Williams when Myron entered the clinic on the morning of the shooting. We find plaintiff's distinction without real difference. Lewis would not have known to call the police or to alert Williams when Myron, a regular and long-time employee of the facility, entered the building unless she *anticipated* his subsequent criminal action. We will not judge the foreseeability of

-7-

criminal conduct by whether, in hindsight, it could have been avoided. *Brown*, 478 Mich at 555-556. For the reasons provided, Lewis had no duty to take any action to warn Williams or prevent Myron from committing a crime she could not reasonably foresee.

## IV. THIRD-PARTY BENEFICIARY

For the first time in response to defendants' motion for summary disposition, plaintiff argued that Advanced Security owed Williams a duty of contract performance as a third-party beneficiary of the contract between Park and Advanced Security.

The rights of third-party beneficiaries in Michigan are governed by MCL 600.1405, which states in pertinent part:

> Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.

> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person.

According to our Supreme Court,

> the plain language of this statute reflects that not every person incidentally benefitted by a contractual promise has a right to sue for breach of that promise, but rather only if the promisor has "undertaken to give or to do or refrain from doing something *directly* to or for said person." [*Brunsell v City of Zeeland*, 467 Mich 293, 296; 651 NW2d 388 (2002), quoting MCL 600.1405(1).]

" '[A] third-party beneficiary may be a member of a class, but the class must be sufficiently described.' " *Shay v Aldrich*, 487 Mich 648, 663; 790 NW2d 629 (2010), quoting *Koenig v South Haven*, 460 Mich 667, 680; 597 NW2d 99 (1999). "When determining whether MCL 600.1405 applies to a purported third-party beneficiary, 'a court should look no further than the form and meaning of the contract itself' and should view the contract objectively." *Boylan v Fifty Eight LLC*, 289 Mich App 709, 729; 808 NW2d 277 (2010), quoting *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422, 428; 670 NW2d 651 (2003).

Park contracted with Advanced Security's predecessor, Nation Wide Security, Inc., in 1996 to provide security services for the clinic. That contract, assumed by Advanced Security in 2008, is not before this Court, and both parties acknowledge that the pertinent terms of the contract cannot be located. Vice President and General Manager of Advanced Security, Will Riley explained in an affidavit that "[t]he security guard services [Advanced Security] provides to [Park] are for ununiformed, unarmed guards . . . to deter car theft and other crimes such as loitering, littering, and vandalism[.]" Similarly, John McBryde, Park's clinical director, testified that the goal in hiring a security company was to "deter theft of cars," and maintain a visible security presence for the benefit of patients and employees.

Plaintiff relies on other Advance Security documents, such as its security officer's guide and security officer's post orders, to establish a contracted duty to protect the lives of Park's employees. As an example, the security officer's guide contains a code of ethics, wherein the role of a security officer is described as "protecting life and property [and] preventing and reducing crimes within the limits of the facility where assigned," and Advanced Security's mission expressly includes protecting "the lives of employees and others on the property." On appeal, neither party addresses the question of whether these documents should be incorporated into the agreement between Park and Advanced Security, although an incorporation of such documents could arguably support plaintiff's claim that Williams, as a Park employee, was entitled to third-party beneficiary status. Regardless, the question of whether Williams was an intended third-party beneficiary of the contract between Park and Advanced Security is irrelevant. Even assuming Williams was a third-party beneficiary of the contract, her status as such would not create a cause of action for negligent performance in this instance.

"The third-party-beneficiary statute indicates that the Legislature intended to allow parties who are direct beneficiaries to sue to enforce their rights, but the statute expressly states that third-party beneficiaries have only the 'same right' to enforce as they would if the promise had been made directly to them." *Shay*, 487 Mich at 675, quoting MCL 600.1405. In other words, "the statute creates a cause of action, but it is not intended to afford third parties greater rights than they would have if they had been the original promisee." *Id*. at 675-676. Courts must therefore apply traditional contractual principles to determine the scope of a third-party beneficiary's rights. *Id*. at 676. One such principle, long accepted by our Courts and applied to third-party beneficiaries, is that "a tort action will not lie when based solely on the nonperformance of a contractual duty." *Fultz v Union-Commerce Assoc*, 470 Mich 460, 466; 683 NW2d 587 (2004). "The failure to perform a contractual duty cannot give rise to a tort action unless the plaintiff alleges a violation of a duty 'separate and distinct' from the underlying contractual obligation." *Kisiel v Holz*, 272 Mich App 168, 172; 725 NW2d 67 (2006), quoting *Rinaldo's Constr Corp v Mich Bell Tel Co*, 454 Mich 65, 84; 559 NW2d 647 (1997). As previously discussed, Advanced Security owed Williams no duty separate and distinct from any duty it may have owed her under the terms of its contract with Park. Plaintiff therefore has no cause of action against Advanced Security for any allegedly negligent performance of the contract between Park and Advanced Security.

## V. VOLUNTARY ASSUMPTION OF DUTY

At the hearing on defendants' motion for summary disposition, plaintiff also suggested that by undertaking to provide security for Park and its employees, Advanced Security voluntarily assumed a duty to protect Williams. Plaintiff seemingly relies on the Restatement (Second) of Torts § 324A, which provides in pertinent part:

> [o]ne who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed to the other or to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Neither party raises the issue on appeal, and ordinarily, we would not address it. See *Tingley v Kortz*, 262 Mich App 583, 588; 688 NW2d 291 (2004) (explaining that this Court does not ordinarily address issues not raised on appeal). However, the issue was raised before the trial court and, for completeness, we note that plaintiff's argument would not preclude summary disposition. Our Supreme Court has considered the application of § 324A and held that its breadth is limited by our case law. *Fultz*, 470 Mich at 464-465. Specifically, the Court determined that § 324A, while generally an accurate representation of Michigan law, did not account for the principle that "a tort action will not lie when based solely on the nonperformance of a contractual duty." *Id*. at 466. "Accordingly, the lower courts should analyze tort actions based on a contract and brought by a plaintiff who is not a party to that contract by using a 'separate and distinct' mode of analysis," rather than analyze the action as one of voluntary assumption of duty under the Restatement. *Id*. at 467.

## VI. CAUSATION

Defendants also argue that the trial court erred when it denied their motion for summary disposition on the ground that plaintiff failed to establish the element of causation necessary to support her negligence claim. Because we have concluded that defendants were entitled to summary disposition for plaintiff's failure to establish the element of duty, we need not address defendants' argument with respect to causation.

## VII. CONCLUSION

Plaintiff failed to establish any duty owed by defendants to Williams, and defendants were entitled to summary disposition. The trial court's order denying defendants' motion for summary disposition is reversed. We remand the matter to the trial court with instructions to enter summary disposition in favor of defendants on plaintiffs' negligence claims. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Michael F. Gadola

-10-