CAVANAGH, J.
(dissenting). I dissent from the majority’s decision to overrule Champion v Nation Wide Security, Inc, 450 Mich 702; 545 NW2d 596 (1996), a unanimous decision of this Court.[1] As the majority flatly admits, there are no significant factual differences between this case and Champion. Accordingly, because Champion was correctly decided and reflects the purpose and legislative intent of the Michigan Civil Rights Act (CRA), MCL 37.2101 et seq., I would apply Champion to this case and affirm the judgment of the Court of Appeals.
I. SUMMARY OF CHAMPION
In Champion, the plaintiff’s supervisor offered job security in exchange for sexual favors, and when the plaintiff refused, the supervisor used his authority to *37 isolate the plaintiff in a remote portion of the building where they worked and raped her.[2] This Court explained that under MCL 37.2103(i), a party pursuing a quid pro quo harassment claim in an employment context must establish “(1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer’s agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment.” Champion, 450 Mich at 708-709. Like defendants in this case, the defendant in Champion argued that the plaintiff could not satisfy the second prong of a quid pro quo sexual harassment claim because the attacker was acting outside the scope of his authority when he raped the plaintiff and, as a result, was not acting as the defendant’s agent. This Court unanimously rejected that argument, stating that “when an employer gives its supervisors certain authority over other employees, it must also accept responsibility to remedy the harm caused by the supervisors’ unlawful exercise of that authority.” Id. at 712. We further noted that “an employer rarely authorizes an agent to break the law or otherwise behave improperly; yet, liability is frequently imputed to an employer for such conduct.” Id. at 712 n 7.
In concluding that the plaintiff could pursue a quid pro quo sexual harassment claim against the defendant, Champion explained that a contrary result would “create an enormous loophole in the statute” that “would *38 defeat the remedial purpose underlying this state’s civil rights statute and would lead to a construction that is inconsistent with the well-established rule that remedial statutes are to be liberally construed.” Id. at 713, citing Eide v Kelsey-Hayes Co, 431 Mich 26, 34; 427 NW2d 488 (1988).
II. CHAMPION WAS CORRECTLY DECIDED
The majority claims that Champion “was contrary to the plain language of the CRA,” ante at 22, and, thus, was wrongly decided. Although I generally agree with the majority that the CRA incorporated the common law of agency, the exception to common-law agency principles established in Champion was necessary to give effect to the broad purpose of the CRA and the Legislature’s intent in enacting it. See Henson v City of Dundee, 682 F2d 897, 910 n 21 (CA 11, 1982) (recognizing that “[t]he common law rules of respondeat superior will not always be appropriate to suit the broad remedial purposes” of civil rights statutes).[3] Furthermore, this Court has previously considered the purpose of the CRA as a method of discerning the legislative intent behind the act. See Victorson v Dep’t of Treasury, 439 Mich 131, 143-144; 482 NW2d 685 (1992). Indeed, even the majority recognizes that a statute’s purpose is a relevant consideration in determining the legislative intent. See ante at 22 n 58.
*39 The CRA recognizes that “freedom from discrimination because of sex is a civil right.” Chambers v Trettco, Inc, 463 Mich 297, 309; 614 NW2d 910 (2000). Thus, the CRA is intended to “remedy[] discrimination in employment, ... public accommodations, services, and educational institutions.” Eide, 431 Mich at 31; see, also, Miller v C A Muer Corp, 420 Mich 355, 363; 362 NW2d 650 (1984) (“The Michigan civil rights act is aimed at the prejudices and biases borne against persons because of their membership in a certain class... and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases.”) (quotation marks and citations omitted).[4] Furthermore, as the majority acknowledges, the CRA is a remedial statute, and “remedial statutes are to be liberally construed....” Eide, 431 Mich at 34.
In light of this understanding of the CRA’s purpose and the Legislature’s intent in enacting the CRA, I believe that Champion properly advanced the legislative intent by ensuring that clearly discriminatory conduct is eradicated. The majority’s interpretation, however, bars plaintiff from pursuing a claim in furtherance of this goal and ignores “the legislative intent that employers, not the victims of sexual harassment, bear the costs of remedying and eradicating discrimination.” Champion, 450 Mich at 714. The majority erroneously discards Champion’s interpretation of the leg *40 islative intent as based “purely on policy considerations,” ante at 25, and ignores the fact that the policy considerations discussed in Champion were the motivation behind the Legislature’s enactment of the CRA..[5] As a result, “in seeking to shield employers from liability, the majority instead places the burden of preventing an abuse of authority and the corresponding harm on people powerless to prevent it.” Zsigo v Hurley Med Ctr, 475 Mich 215, 236; 716 NW2d 220 (2006) (Marilyn Kelly, J., dissenting).
Moreover, the majority’s reliance on Chambers to support its conclusion that Champion was wrongly decided is misplaced. In fact, Chambers expressly acknowledged Champion's holding as a valid part of Michigan’s common law related to quid pro quo sexual harassment under the CRA. See Chambers, 463 Mich at *41 311 (“Vicarious liability exists in the case of quid pro quo harassment because the quid pro quo harasser, by definition, uses the power of the employer to alter the terms and conditions of employment. Champion, supra”).
Similarly, the majority erroneously interprets Zsigo as supporting its conclusion that Champion misinterpreted the CRA. The Zsigo majority expressly recognized that the Champion Court, like many other courts, applied an exception to quid pro quo sexual harassment claims that is very similar to the aided-by-agency exception. Zsigo, 475 Mich at 227 n 28 (listing state and federal opinions adopting the aided-by-agency exception in sexual harassment cases). While I continue to adhere to the Zsigo dissent’s conclusion that a narrowly tailored interpretation of the aided-by-agency exception should be applied outside the context of sexual harassment cases, that disagreement with Zsigo is of no moment in this case, given that the case before us is obviously a quid pro quo sexual harassment claim. Thus, under Chambers and even under the majority opinion in Zsigo, Champion’s exception applies to this case.[6]
*42 Finally, contrary to the majority’s concern that Champion created an exception that swallows the general agency rules, Champion’s exception “does not extend unlimited liability to employers whose supervisors rape subordinates.” Champion, 450 Mich at 713. A mere supervisor-subordinate relationship is not enough. Rather, an employer is only liable when “the supervisor accomplishes the rape through the exercise of his supervisory power over the victim.” Id. at 713-714 (emphasis added). As Champion explained, this approach is “fully consistent. . . with the legislative intent that employers, not the victims of sexual harassment, bear the costs of remedying and eradicating discrimination.” Id. at 714.
Furthermore, as the dissent in Zsigo aptly explained, it is entirely possible to adopt a narrowly tailored interpretation of the aided-by-agency exception in order to avoid swallowing the general agency rules. Zsigo, 475 Mich at 239-243 (MARILYN KELLY, J. dissenting).[7] After *43 reviewing various other jurisdictions’ efforts to balance the scope of the aided-by-agency exception, the Zsigo dissent concluded that an opinion from the Vermont Supreme Court represented the most compelling approach. See Doe v Forrest, 2004 VT 37, ¶ 21; 176 Vt 476; 853 A2d 48 (2004), citing Burlington Indus, Inc v Ellerth, 524 US 742; 118 S Ct 2257; 141 L Ed 2d 633 (1998), and Faragher v Boca Raton, 524 US 775; 118 S Ct 2275; 141 L Ed 2d 662 (1998). Doe explained that under Faragher, in order to properly apply the aided-by-agency exception, a court should consider three factors: (1) “the opportunity for contact created by the relationship,” (2) “the powerlessness of the employee to resist the perpetrator and prevent the unwanted contact,” and (3) “the opportunity to prevent and guard against the conduct.” Doe, 2004 VT 37 at ¶ 33; 176 Vt at 491. Thus, in response to the questions posed by the majority regarding when an employer will be held liable for an employee’s conduct, see ante at 34, an employer would only be liable for quid pro quo sexual harassment arising out of an employee’s conduct if the three factors were met, or, as Champion put it, when “the supervisor accomplishes the rape through the exercise of his supervisory power over the victim.” Champion, 450 Mich at 713-714 (emphasis added). Accordingly, Champion can be applied without imposing the boundless liability that the majority fears.
In summary, Champion properly relied on the legislative intent and the purpose behind the CRA when it adopted a widely accepted exception to the general rules *44 of agency. And given that the Legislature has not chosen to amend the applicable CRA provisions during the 15 years since Champion was decided, I think that it is fair to conclude that the Legislature believes that Champion accurately reflected the legislative intent behind the CRA, rather than representing a dangerous departure from it, as the majority claims. See, e.g., Devillers v Auto Club Ins Ass’n, 473 Mich 562, 613-614; 702 NW2d 539 (2005) (CAVANAGH, J., dissenting) (explaining the significance of the Legislature’s decision not to modify a statute after this Court has interpreted it). Because it is “ ‘the nature of the common law that every appellate decision represents the development of the common law,’ ” Zsigo, 475 Mich at 241 n 11 (MARILYN KELLY, J., dissenting) (citation omitted), Champion has been a valid part of Michigan’s common law for the last 15 years and should be applied in this case.
III. STARE DECISIS
In light of the preceding analysis, it is clear that Champion furthers the Legislature’s intent when it enacted the CRA. As a result, Champion was correctly decided and no further stare decisis consideration is needed. However, even accepting the majority’s faulty conclusion that Champion was wrongly decided, I do not agree that its decision to overrule Champion is supported by stare decisis principles.
The United States Supreme Court has explained that the doctrine of stare decisis “promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.” Payne v Tennessee, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991). As a result, “a stare decisis analysis should always begin with the presump *45 tion that upholding the precedent involved is the preferred course of action.” Petersen v Magna Corp, 484 Mich 300, 317; 773 NW2d 564 (2009) (opinion by MARILYN Kelly, C.J.). Thus, “overturning precedent requires more than a mere belief that a case was wrongly decided,” McCormick v Carrier, 487 Mich 180, 211; 795 NW2d 517 (2010), and the presumption in favor of upholding precedent “should be retained until effectively rebutted by the conclusion that a compelling justification exists to overturn the precedent,” Petersen, 484 Mich at 317 (opinion by MARILYN KELLY, C.J.).[8]
Several of the criteria discussed in Petersen weigh particularly heavily in favor of upholding Champion rather than overruling it: (1) Champion provided a practical and workable rule, (2) Champion has not been robbed of significant application or justification because it remains a highly significant and relevant guidepost in the area of civil rights law, (3) other jurisdictions have adopted exceptions similar to the one in Champion, and (4) overruling Champion is likely to result in serious detriment prejudicial to public interests. See Petersen, 484 Mich at 320.[9]
*46 Contrary to the majority’s claims, Champion has not proved to be unworkable, and thus this criterion weighs in favor of upholding Champion. Again, although I disagree with the Zsigo majority’s decision to limit Champion by applying it only to cases raising quid pro quo sexual harassment claims, that limitation is an example of an arguably workable bright-line rule regarding the scope of Champion’s exception. Therefore, the majority’s claim that Champion is unworkable because it results in unlimited vicarious liability “despite our attempt in Zsigo to limit Champion,” ante at 25, is inexplicable.[10]
Indeed, the Court of Appeals opinions the majority cites in support of this claim, ante at 26-27 n 68, are either irrelevant or demonstrate Champion’s workability rather than its unworkability.
In Diamond v Witherspoon, 265 Mich App 673; 696 NW2d 770 (2005), and its companion case, the Court of Appeals rejected a city’s claims of governmental immunity and permitted the plaintiffs to bring quid pro quo sexual harassment claims under the CRA based on the same city police officer’s sexual conduct during traffic stops. The *47 Court of Appeals explained that governmental immunity is not a defense to actions under the CRA but did not directly address the vicarious liability issues arising out of that case. Id. at 691. As a result, Diamond is of little import in determining Champion’s workability.
The other opinion the majority cites in this regard, Salinas v Genesys Health Sys, 263 Mich App 315; 688 NW2d 112 (2004), actually demonstrates Champion’s workability and exhibits the “meaningful demarcation” that the majority so desperately seeks.[11] See ante at 34. In that case, the Court of Appeals applied the aided-by-agency exception and concluded that vicarious liability did not extend to the employer because the attacker’s agency relationship with the defendant merely provided the attacker with the opportunity to commit the sexual assault. Thus, the agency relationship did not aid the attacker in committing the sexual assault. Salinas, 263 Mich App at 320-321. In my view, Salinas provided an example of how Champion did not create limitless liability, even in the context of quid pro quo sexual harassment claims.[12]
Finally, Champion itself explained that its holding “does not extend unlimited liability to employers . . ..” *48 Champion, 450 Mich at 713. Rather, an employer is only liable if its employee “accomplishes the rape through the exercise of his supervisory power over the victim.” Id. at 713-714. Such a limitation is eminently workable, as the Court of Appeals opinion in Salinas demonstrated. Additionally, as discussed earlier in this opinion, Vermont’s high court has provided a clear example of a narrowly tailored approach to applying the aided-by-agency exception that would limit the scope of an employer’s liability. Doe, 2004 VT 37 at ¶ 33; 176 Vt at 491; see, also, Zsigo, 475 Mich at 239-243 (MARILYN KELLY, J., dissenting) (arguing in favor of adopting Noe’s three-factor test). In sum, Champion has remained workable from the time it was first published until its untimely demise at the hands of the majority today. Thus, this factor weighs in favor of upholding Champion.
Champion also remains a highly significant and relevant guidepost in the area of civil rights law, which weighs in favor of upholding it. Champion remains relevant because it properly recognized that failing to impose liability on an employer when its employees use supervisory powers delegated by the employer to commit quid pro quo sexual harassment is a “far too narrow” construction of agency principles. Champion, 450 Mich at 712. As Champion explains, “immunizing an employer where it did not authorize the offending conduct would create an enormous loophole in the statute.” Id. at 713. Therefore, Champion correctly concluded that when an employer delegates authority to an employee, the employer must accept the responsibility of remedying the harm caused by misuse of that authority, which is consistent with the “legislative intent that employers, not the victims of sexual harassment, bear the costs of remedying and eradicating discrimination.” Id. at 714. Thus, Champion provides *49 important guidance to trial courts and ensures that the legislative intent behind the CRA is implemented. Accordingly, Champion should be upheld.[13]
Further supporting the conclusion that stare decisis does not support overruling Champion is the fact that numerous other jurisdictions have adopted the aided-by-agency exception in the context of civil rights cases. See Petersen, 484 Mich at 320 (opinion by MARILYN Kelly, C.J.). To begin with, as Champion stated, application of the aided-by-agency exception is a “nearly unanimous view” in the context of quid pro quo sexual harassment committed by supervisory personnel. Champion, 450 Mich at 712.[14] The majority opinion, *50 however, claims that Champion and this dissent err in this determination because it is improper to consider federal caselaw.
Although the majority is correct that we are not bound by federal caselaw, it can be instructive, particularly when the federal and state statutes at issue are similar. See, e.g., People v Victor, 287 Mich 506, 548; 283 NW 666 (1939) (endorsing the use of federal caselaw in applying Michigan’s Due Process Clause). Notably, the United States Supreme Court has concluded that the federal Civil Rights Act has a “broad remedial purpose[],” Arizona Governing Comm for Tax Deferred Annuity & Deferred Compensation Plans v Norris, 463 US 1073, 1090; 103 S Ct 3492; 77 L Ed 2d 1236 (1983), to “achieve equality . . . and remove barriers that have operated in the past to favor an identifiable group,” Griggs v Duke Power Co, 401 US 424, 429-430; 91 S Ct 849; 28 L Ed 2d 158 (1971). Given that the legislative intent and purpose behind the CRA and the federal Civil Rights Act are strikingly similar, the United States Supreme Court’s decision to adopt an exception to further that purpose in Ellerth and Faragher is persuasive authority in favor of upholding Champion.
Furthermore, regardless of whether “[o]nly a few jurisdictions have adopted the [aided-by-agency] exception wholesale . . . such that it applies to a typical tort claim,” ante at 24 n 63, many of our sister states have — as this Court did in Champion — adopted comparable exceptions in the realm of civil rights sexual harassment cases in order to accomplish goals analogous to those in the CRA.[15] Thus, it is clear that *51 Champion is not an “inexplicable exception,” ante at *52 21-22 n 54 (quotation marks and citation omitted), or “isolated aberration,” ante at 25, nor is it “hard to square . . . with any conventional notion of agency,” ante at 21 n 54 (quotation marks and citation omitted). Rather, Champion reflects a well-reasoned exception to the general rules of agency that many other jurisdictions have adopted in order to ensure that civil and human rights statutes are successful in achieving the goal of suppressing the evil of sexual harassment.
Finally, the fact that the majority’s decision in this case is likely to result in serious detriment prejudicial to public interests weighs heavily in favor of upholding Champion. See Petersen, 484 Mich at 320 (opinion by Marilyn Kelly, C.J.). As discussed at length in this opinion, Champion properly recognized the significant public interest embodied in the CRA and adopted a narrow exception to traditional agency rules that accurately reflects the legislative intent to require employers to bear the costs of remedying and eradicating discrimination. By overruling Champion, the majority instead places that burden on the very people whom the CRA is intended to protect and who are powerless to prevent the discrimination that the CRA is intended to eliminate. The detriment to the public interest created by the majority opinion today is obvious and weighs heavily in favor of affirming Champion.
In summary, Champion (1) provides a practical and workable rule in furtherance of the purpose of the CRA, (2) has not been robbed of significant application or *53 justification because it remains a highly significant and relevant guidepost in the area of civil rights law, (3) is consistent with the caselaw of other jurisdictions that have adopted the aided-by-agency exception, and (4) avoids a serious detriment prejudicial to public interests. Therefore, in my view, the principles of stare decisis do not support the majority’s decision to overrule Champion.
IV THE MAJORITY REACHES THE WRONG RESULT UNDER ANY STANDARD
The majority’s application of its own standard is hopelessly flawed. The majority immunizes defendants from liability in this case by concluding that Johnson’s acts were unforeseeable. Ante at 16. The majority supports this conclusion by claiming that, even when viewed in the light most favorable to plaintiff, Johnson’s past violent conduct toward members of the public and inmates merely amounted to “a propensity to disobey work-related protocol.. . .”[16] Ante at 16. Furthermore, the majority concludes that Johnson’s rape of plaintiff was “highly unpredictable,” ante at 13, and, “in essence, unpreventable,” ante at 15.
The majority’s characterization of Johnson’s conduct is extraordinarily one-sided, however. First, Johnson’s conduct was clearly not “unpreventable” because defendants had a policy in place that required a female officer to be present anytime a female inmate was in the jail. *54 Presumably, the motivation behind this policy is at least in part to prevent the type of conduct that Johnson committed in this case. Defendants violated that policy on the night in question, which allowed Johnson to use the supervisory powers delegated to him by defendants to violently rape plaintiff. Thus, the rape of plaintiff was entirely preventable, had defendants merely followed their own policy. Furthermore, the fact that such a policy existed also strongly implies that defendants considered conduct like Johnson’s foreseeable. Therefore, regardless of whether the rape was preventable, defendants’ policy is one of several factors that create a genuine issue of material fact regarding whether Johnson’s conduct was foreseeable, even under the majority’s flawed new test.[17]
Second, as the majority concedes, Johnson’s alleged threatening calls to his landlord and the physical altercation with an inmate reveal Johnson’s tendency to react violently when provoked. One would think that working as a deputy in a jail would entail frequent provocation by inmates. Accordingly, tendencies such as those displayed by Johnson, when viewed in the light most favorable to plaintiff, present a genuine issue of material fact regarding whether his subsequent violent rape of an inmate was sufficiently foreseeable to hold defendants vicariously liable.
The majority strains to support the weight of its misguided holding by citing the majority opinion in Brown v Brown, 478 Mich 545; 739 NW2d 313 (2007).[18] *55 In Brown, the attacker had no criminal history and had not previously committed any violent acts but had repeatedly made heinous sexual comments to the plaintiff of which the defendant-employer was aware. Subsequently, while working with the plaintiff on the night shift, the attacker violently raped the plaintiff. The Brown majority concluded that the defendant’s knowledge of the attacker’s comments alone were not sufficient to make the subsequent rape foreseeable. Id. at 554-555. The Brown majority chastised the Court of Appeals panel in that case for relying on Hersh v Kentfield Builders, Inc, 385 Mich 410; 189 NW2d 286 (1971), to reach the opposite conclusion because, according to the Brown majority, Hersh was distinguishable on its facts. In Hersh, an employee who had a prior manslaughter conviction violently attacked a client of the defendant-employer. This Court unanimously held that the defendant-employer was liable for its employee’s violent attack on the client because the defendant knew of the employee’s past violent act. Id. at 413.[19] The Brown majority seized on this reasoning to conclude that the defendant in Brown could not be liable for its employee’s rape of the plaintiff because the employee had only engaged in “boorish” sexual comments toward the plaintiff but had no history of violent acts. Brown, 478 Mich at 557-562.
Although the Brown majority’s analysis created a dangerous rule whereby “no infirmity of character, shown by speech, [is] sufficient to allow a jury to decide whether, in light of the employee’s conduct, the employer had a duty to act,” id. at 576 (CAVANAGH, J., *56 dissenting), Johnson’s conduct in this case, when viewed in the light most favorable to plaintiff, was sufficient to raise a genuine issue of material fact even under the rule in Brown. Johnson did not merely engage in sexual comments toward plaintiff; rather, he had a specific history of violent and abusive behavior toward inmates.[20] Therefore, because the unanimous *57 Hersh Court and the majority in Brown concluded that an employee’s prior violent criminal acts are generally sufficient to put a defendant on notice of the employee’s propensity to commit similar violent acts,[21] defendants’ knowledge of Johnson’s prior violent acts is sufficient to at least raise a genuine issue of material fact regarding the foreseeability of his eventual rape of plaintiff.[22] Accordingly, even under the majority’s newly adopted standard for quid pro quo sexual harassment claims under the CRA, the majority reaches the wrong result in this case.
*58 Finally, by overruling Champion, the majority has caused a major shift in Michigan’s quid pro quo sexual harassment jurisprudence. Thus, even if I agreed with the majority’s new standard, I could not support its hasty decision to reverse the judgment of the Court of Appeals. As the majority readily admits, Champion clearly applies to this case, and plaintiffs arguments appropriately focused on the principles set forth in Champion rather than the majority’s newly imposed foreseeability analysis.[23] As a result, the Court of Appeals did not consider the merits of plaintiffs claims under the foreseeability standard that the majority now *59 adopts. Accordingly, the majority should not reach the merits of this case because this unexpected shift away from Champion prevented plaintiff from making arguments related to the standard that the majority now applies. Rather, given its holding, the majority should remand this case to the lower courts for further proceedings so that plaintiff may develop arguments related to the majority’s newly applicable, yet erroneous, standard for quid pro quo sexual harassment claims.
V CONCLUSION
I disagree with the majority’s decision to overrule Champion because that case was correctly decided and furthers the legislative intent and purpose of the CRA. Moreover, the doctrine of stare decisis weighs against overruling Champion. Furthermore, the majority misapplies its newly created standard in this case and usurps the role of the jury when it concludes that defendants are entitled to a favorable decision as a matter of law. Accordingly, I dissent.
Marilyn Kelly, J., concurred with Cavanagh, J.

 The concurring justices joined the analysis in full. See Champion, 450 Mich at 714 (Boyle, J., concurring).

 Although many opinions address this issue in the context of workplace supervisor-subordinate relationships, those opinions are applicable to this case because the analysis is largely rooted in the recognition that a supervisor wields substantial authority over a subordinate, just as a sheriffs deputy, acting under color of law, holds significant authority over a jail inmate.

 This Court has recognized that the purpose of a statute is a relevant consideration when applying the statute in a broad array of cases. See, e.g., Adair v Michigan, 486 Mich 468, 477; 785 NW2d 119 (2010) (stating that “the primary and fundamental rule of constitutional or statutory construction is that the Court’s duty is to ascertain the purpose and intent as expressed in the constitutional or legislative provision in question”) (emphasis added). Indeed, the members of the majority in this case recently found the purpose of the Michigan Campaign Finance Act worthy of lengthy consideration inMich Ed Ass’n v Secretary of State (On Rehearing), 489 Mich 194; 801 NW2d 35 (2011).

 The majority’s suggestion that the language of the CRA does not support this interpretation of the act’s purpose is remarkable, given that this Court’s opinions in Eide, Miller, and many other cases have similarly summarized the CRA’s purpose. See, e.g., Radtke v Everett, 442 Mich 368, 379; 501 NW2d 155 (1993) (quoting the CRA and concluding that “[t]he Civil Rights Act is aimed at the prejudices and biases borne against persons because of their membership in a certain class, and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases”) (quotation marks and citations omitted); see, also, MCL 37.2102, MCL 37.2202, and MCL 37.2302.

 Ironically, the majority in this case also relies on policy considerations, claiming that Champion creates an unfair “societal burden” and an unbearable financial burden on employers. Ante at 14-15, 28-29. It is odd that the majority opinion finds it appropriate to rely on these policy considerations while simultaneously rejecting Champion for its consideration of the policy concerns reflected in the CRA. Setting that contradiction aside, however, what is even more telling is the fact that Champion’s policy considerations were rooted in the legislative intent and purpose of the CRA. Indeed, the CRA’s title expressly states that the CRA is intended to “prohibit discriminatory practices, policies, and customs ....” Title of 1976 PA 453. The majority opinion in this case does exactly the opposite in furtherance of policy considerations that do not appear in the CRA. Nowhere did the Legislature indicate that the “societal burden” or the financial burden on employers is a valid consideration when interpreting and applying the act. In fact, the CRA indicates that the Legislature intended that governmental employers bear the cost of eliminating sexual harassment, not avoid it, as shown by the specific inclusion of state and political subdivisions and their agents as employers covered by the act. MCL 37.2103(g) and (h) and MCL 37.2201(a); see, also, Mack v Detroit, 467 Mich 186, 195; 649 NW2d 47 (2002) (noting that there are areas in which “the Legislature has allowed specific actions against the government to stand, such as the Civil Rights Act”).

 Although the majority is correct that Zsigo held that the aided-by-agency exception is not a part of Michigan’s general common law, the majority’s efforts to counter this dissent’s interpretation of Chambers and Zsigo are unavailing because both of those opinions recognized that Champion’s exception applied in the context of quid pro quo sexual harassment cases, as the majority acknowledges. See ante at 21; see, also, Chambers, 463 Mich at 311 (citing Champion for the premise that “[v]icarious liability exists in the case of quid pro quo harassment because the quid pro quo harasser, by definition, uses the power of the employer to alter the terms and conditions of employment”), and Zsigo, 475 Mich at 224 n 19 (recognizing that Champion applies “in the context of quid pro quo sexual harassment under MCL 37.2103G)”). Indeed, the fact that the majority finds it necessary to expressly overrule Champion today further demonstrates that Chambers and Zsigo did not dispatch the exception created in Champion. The majority’s refusal to accept the *42 fact that Champion has been part of Michigan’s common law for the last 15 years does not make its view so. Rather, as this dissent thoroughly explains, Champion is a longstanding, unanimous precedent of this Court that is consistent with the purpose and legislative intent behind the CRA and with the approach taken by the United States Supreme Court and many other jurisdictions in similar civil rights cases. Accordingly, the majority is mistaken when it claims that I seek to “aggressively expand the law of this state” while it merely seeks to “reaffirm!] ... common-law rules that have always governed in Michigan.” Ante at 33. Rather, as demonstrated by its need to overrule a deep-rooted opinion of this Court, it is the majority that embarks on an ill-advised major change in the law.

 The majority erroneously implies that I only rely on nonbinding dissenting opinions of this Court to support my conclusion that Champion was correctly decided. Although I think that the Zsigo dissent provides an example of a narrow, workable interpretation of the aided-by-agency exception, the bulk of my analysis in support of my conclusion that Champion was correctly decided rests on the reasoning from Champion’s well-established and unanimous opinion, which was not overruled by either of the majority opinions in Chambers and Zsigo. Surprisingly, the majority disparages my analysis for relying on Cham *43 piort’s reasoning, see ante at 31 n 79, but I am quite certain that relying on longstanding, unanimous precedent from this state’s highest court is a well-accepted method of legal analysis. Furthermore, I disagree with the majority’s claim that Champion is the only “binding Michigan law” supporting my conclusion. Ante at 31 n 79. Rather, I believe that the CRA itself also supports my analysis.

 In Petersen, then Chief Justice Marilyn Kelly provided a nonexhaustive list of criteria for consideration when a court engages in a stare decisis analysis, hut no single criterion is determinative, and a given criterion need only be evaluated if relevant. Petersen, 484 Mich at 320. The majority’s implication that my stare decisis analysis is invalid because I apply Petersen is misplaced, given that Petersen’s test simply expands on the test from Robinson v Detroit, 462 Mich 439, 464; 613 NW2d 307 (2000). Further Petersen is more respectful of precedent, and thus is more consistent with the principles of stare decisis. See Petersen, 484 Mich at 315-319 (opinion by Marilyn Kelly, C.J.).

 Although Chief Justice Kelly also recognized that reliance on the rule in question may be a valid consideration when engaging in a stare decisis analysis, the majority’s extensive reliance on this factor to support its decision to overrule Champion is misplaced. In my view, this factor is of little importance in this case because no one plans on being sexually harassed or employing persons who commit sexual harassment. Thus, *46 there is little reason for anyone to “conform his conduct to a certain norm” in reliance on Champion. Ante at 27 (quotation marks and citation omitted). Rather, Champion provided a remedy for an unexpected and unwelcome event. Therefore, I find unpersuasive the majority’s claim that Champion may be overruled because parties have not relied on its holding to their detriment.

 Moreover, the majority’s claim that Champion allows plaintiffs to engage in “[a]rtful pleading,” ante at 29 n 74, in order to “avoid governmental immunity by framing a claim under the CRA,” ante at 26, is misplaced and, frankly, offensive. See, also, ante at 31 n 78. Plaintiff in this case, and presumably the plaintiffs in other sexual harassment cases, bring actions under the CRA because the sexual harassment infringed on their civil rights. By assuming that plaintiffs bring CRA claims to manipulate the judicial system, the majority throws salt in these plaintiffs’ raw wounds.

 Moreover, as discussed earlier in this dissent, the three-prong test established in floe, 2004 VT 37, and favored by the Zsigo dissent further establishes a “meaningful demarcation” of an employer’s liability for an employee’s improper use of delegated supervisory authority.

 Contrary to the majority’s claims, the distinction exemplified by Salinas is quite clear: if an employee is merely presented with an opportunity to commit sexual harassment by having the employer’s permission to be in a certain location, the employer is not vicariously hable because the employee did not use any employer-delegated authority to aid in the creation of the opportunity to commit the sexual harassment. But if, as in Champion and the case at bar, the employee actively uses the powers delegated by the employer to direct the victim to a location or otherwise create circumstances that aid in the commission of sexual harassment, vicarious liability may attach.

 The majority also states that because “the drafters of the Third Restatement of Agency have excluded the aided-by-agency exception included in the Second Restatement of Agency,” ante at 19 n 42, Champion no longer reflects the preferred approach and I “ignore” this “changeD in the law,” ante at 31-32 n 79. To begin with, as the comments to the Third Restatement of Agency explain, the Third Restatement now addresses “[t]he purposes likely intended to be met by the ‘aided in accomplishing’ basis [for imposing vicarious liability]... by a more fully elaborated treatment of apparent authority and by the duty of reasonable care that a principal owes to third parties with whom it interacts through employees and other agents” elsewhere in the Restatement. 2 Restatement Agency, 3d, § 7.08, comment b, p 228. Thus, there has arguably been no “changeD in the law,” given that the Third Restatement of Agency addresses the same concerns represented by the aided-by-agency exception from the Second Restatement of Agency. And, regardless, the Restatement has no precedential value and, thus, is not “the law.” Champion, on the other hand, obviously has substantial precedential value as a well-established, unanimous opinion of this Court. Accordingly, any support for overruling Champion that the majority derives from the fact that the Third Restatement of Agency no longer expressly includes the aided-by-agency exception is unpersuasive, especially when, as noted later in this opinion, other jurisdictions continue to apply that exception.

 Although the majority mistakenly attributes this premise to me, see ante at 35, it was actually the unanimous Champion Court that concluded that its holding was consistent with the majority of other jurisdictions. I do, however, agree with Champion’s conclusion, given that, as explained in footnote 15 of this opinion, the United States Supreme Court and many states apply Champion-like exceptions in the context of civil rights cases.

 See, e.g., Farmers Ins Group v Santa Clara Co, 11 Cal 4th 992, 1016 n 14; 47 Cal Rptr 2d 478; 906 P2d 440 (1995) (acknowledging that the applicable statutes “indicate that respondeat superior and scope of employment principles are supposed to play an integral role in fixing an *51 employer’s liability for both supervisor and nonsupervisor sexual harassment” but applying the aided-by-agency exception because “it is reasonably clear that the purpose underlying the comprehensive statutory scheme is to ensure that all employers maintain their worksites free from prohibited sexual harassment, regardless of the lack of foreseeability of such harassment in their particular enterprises”); Doe, 2004 VT 37 at ¶ 39; 176 Vt at 494 (adopting the aided-by-agency exception, in part because it creates an “incentive for vigilance” by those in the best position to prevent harassing behavior); Lehmann v Toys ‘R’ Us, Inc, 132 NJ 587, 619; 626 A2d 445 (1993) (adopting the aided-by-agency-exception in sexual harassment cases to ensure “just results in the great variety of factual circumstances presented by sexual harassment cases and to accomplish the [statutory] purposes”); Ocana v American Furniture Co, 2004-NMSC-018, ¶ 31; 135 NM 539, 552; 91 P3d 58 (2004) (adopting the aided-by-agency theory because it “further[s] the policies that underlie tort law” by redistributing the economic burden from injured individuals and deterring objectionable conduct in the future); College-Town, Div of Interco, Inc v Mass Comm Against Discrimination, 400 Mass 156, 165; 508 NE2d 587 (1987) (noting that although the court was not bound by federal courts’ interpretation of analogous federal statutes, vicarious liability based on a standard similar to the aided-by-agency exception was appropriate in order to remain consistent with the statute’s purpose and clear legislative intent “that an employer be liable for discrimination committed by those on whom it confers authority”); Frieler v Carlson Mktg Group, Inc, 751 NW2d 558, 567-570 (Minn, 2008) (adopting the aided-by-agency exception for sexual harassment cases as consistent with the purposes of the Minnesota Human Rights Act); Veco, Inc v Rosebrock, 970 P2d 906, 914 (Alas, 1999) (adopting the aided-by-agency theory because harassment by supervisors is “facilitated, made more serious, and is less apt to be reported because supervisors are understood to be clothed with the employer’s authority”) (citation and quotation marks omitted); Parker v Warren Co Utility Dist, 2 SW3d 170,176 (Tenn, 1999) (adopting the aided-by-agency exception for sexual harassment claims under Tennessee’s human rights act for the reasons stated in Ellerth and Faragher)-, American Gen Life & Accident Ins Co v Hall, 74 SW3d 688, 692 (Ky, 2002) (acknowledging that Kentucky applies the aided-by-agency exception to sexual harassment claims under Kentucky’s civil rights act consistently with Ellerth and Faragher), Henningsen v World-corn, Inc, 102 Wash App 828, 843; 9 P3d 948 (2000) (applying the aided-by-agency exception in a sexual harassment case); Wal-Mart Stores, Inc v Itz, 21 SW3d 456, 470 (Tex App, 2000) (same); and Edwards v Ohio Institute of Cardiac Care, 170 Ohio App 3d 619, 627-628; 868 NE2d 721 (2007) (same).
*52 As these opinions make obvious, Champion by no means represents an earth-shattering decision in the realm of civil rights law, and, contrary to the majority’s claim, in no way do I “concede that Champion was unprecedented... .” Ante at 30. Rather, because Champion accurately reflected the legislative intent behind the CRA, I believe that Champion rests on the precedent of the CRA itself.

 The majority attempts to downplay Johnson’s prior violent conduct toward inmates by emphasizing that it was directed at a male inmate who had provoked Johnson. Although inconvenient to the majority’s analysis, it is notable that defendants considered Johnson’s actions “misconduct” and reprimanded him for it. Therefore, it appears that defendants did not consider Johnson’s violent conduct toward an inmate as insignificant as the majority would have us believe.

 The majority bristles at my characterization of its test as “new.” See ante at 14 n 32. However, given that the majority overrules Champion, which it admits would otherwise apply to this case, classifying its test as “new” is entirely accurate, in my judgment.

 Although I continue to adhere to my dissent in Brown, 478 Mich at 570-580 (Cavanagh, J., dissenting), I will apply the majority opinion from Brown because, even under the Brown majority’s excessively narrow *55 standard of foreseeability, this case presents a genuine issue of material fact. And because I apply the rule from the majority opinion in Brown, the majority’s critique of the Brown dissent, ante at 14 n 32, is entirely irrelevant.

 Justice Black concurred in the result. See Hersh, 385 Mich at 416.

 The majority claims that the “dissimilar” nature and the “temporal distance” between Johnson’s past violent conduct and the rape at issue immunizes defendants from foreseeability as a matter of law. First, these arguments abandon the reasoning from Hersh because, in that case, the attacker’s conviction for manslaughter occurred 10 years before the attack in question, and the defendant in Hersh “was not aware of [the attacker’s] specific convictions ....” Hersh v Kentfield Builders, Inc, 19 Mich App 43, 45 n 1; 172 NW2d 56 (1969). Thus, contrary to the majority’s analysis today, the caselaw does not hold that an employee’s conduct is only foreseeable to an employer if the employee had recently committed the precise conduct at issue.
Second, these arguments also demonstrate that the majority’s new test for quid pro quo sexual harassment cases creates a moving target that is impossible for plaintiffs to hit. In Brown, the majority claimed that the attacker’s aggressive sexual comments were not sufficient to make it foreseeable that the attacker would later rape the target of those comments. In this case, even though Johnson had committed a violent act against an inmate in the past, the majority claims that this conduct occurred too long ago and was too dissimilar to the conduct at issue. The majority makes no effort to explain why the acceptable 10-year gap in Hersh is substantially different from the 13-year gap in this case and only summarily argues that Johnson’s prior violent act against an inmate was too dissimilar to his violent rape of plaintiff while she was an inmate. Ante at 16-17 n 36. Viewed in the light most favorable to plaintiff, I fail to see a difference between a violent physical altercation with an inmate and a subsequent violent rape of an inmate that is sufficient to justify deciding this case as a matter of law. Rather, given the substantial similarities between the facts of this case and the facts in Hersh, I believe that this Court’s unanimous conclusion in Hersh that “[w]hether the employer knew or should have known of [the employee’s] vicious propensities should not be determined by any court as a matter of law, but by the jury” is equally applicable to this case, even under the majority’s flawed new test. Hersh, 385 Mich at 415. But under the majority position, this is apparently not so, given that the majority seemingly believes that an employee’s act of committing a rape is only foreseeable if the employer knows that the employee actually raped someone in the recent past. The unworkabilify of such a requirement is obvious.

 Specifically, Hersh, 385 Mich at 413, stated that “ ‘[t]he employer’s knowledge of past acts of impropriety, violence, or disorder on the part of the employee is generally considered sufficient to forewarn the employer,’ ” quoting 34 ALR2d 390, § 9 (emphasis added), and the majority in Brown, 478 Mich at 560, quoted this passage from Hersh.

 Although the majority opinion cites Brown, 478 Mich at 555, for the proposition that “[e]ven the incident of aggression [toward an inmate] did not put defendants on reasonable notice that Johnson would sexually assault an inmate [because] violent actions do not inevitably lead to acts of criminal sexual conduct,” ante at 16, the cited portion of Brown does not actually support that conclusion. Rather, the relevant portion of Brown states that “[cComments of a sexual nature do not inexorably lead to criminal sexual conduct any more than an exasperated, angry comment inexorably results in a violent criminal assault.” Brown, 478 Mich at 555 (emphasis added). Furthermore, Brown later stated, while discussing Hersh, that “it is the employee’s known past acts that provide a basis for the employer’s knowledge of the employee’s ‘impropriety, violence, or disorder’ and that those acts potentially place an employer on notice of the employee’s violent propensities.” Id. at 561. Therefore, it appears that the majority has even further limited the scope of previous conduct by an employee that will be sufficient to put an employer on notice of the employee’s violent propensities. Disregarding the fact that a rape is an “incident of aggression,” the majority claims that Johnson’s previous “incident of aggression” toward an inmate did not make his subsequent rape of plaintiff foreseeable because the previous “incident of aggression” was not a “sexual assault.” The majority’s efforts to distinguish the differences between various violent acts leaves plaintiffs vulnerable to harm and immunizes employers from liability unless an employee commits the exact same act that he or she previously committed. In my view, the majority’s analysis is arbitrary and undercuts the clear legislative intent of the CRA.

 Curiously, the majority proclaims that “[n]o meaningful distinction can be drawn between the facts in Champion and those in the present matter,” ante at 26, but later finds fault in my conclusion that a straightforward application of Champion is appropriate in this case. My conclusion is not faulty; rather, it simply reflects an adherence to the doctrine of stare decisis. It is the majority that falters in its effort to satisfy the burden of explaining its imprudent decision to forgo precedent.
Indeed, the majority’s argument that the “conflicting dispositions in the courts below” support its decision to overrule Champion, ante at 33, is simply one more example of the majority’s misplaced efforts to satisfy its burden. While it is true that the trial court in this case applied Zsigo and the Court of Appeals applied Champion, a simple answer exists for this apparent conflict. Although our trial courts work diligently and, in the vast majority of instances, reach the correct result, the trial courts do, on occasion, err. Indeed, the Court of Appeals and this Court exist in large part to address this reality.
In this case, the trial court erred by applying Zsigo because Zsigo did not consider a quid pro quo sexual harassment claim. Rather, as the Court of Appeals correctly determined, the proper course of conduct in this quid pro quo sexual harassment case was to apply Champion, not Zsigo. Indeed, as repeatedly noted in this dissent, the Zsigo majority recognized that Champion applies “in the context of quid pro quo sexual harassment under MCL 37.2103(i).” Zsigo, 475 Mich at 224 n 19. Therefore, the resolution of this case should be simple: Champion should apply because this is a quid pro quo sexual harassment case. It is the majority that needlessly injects “conflicting precedents and principles.” Ante at 33.